van Gestel, J.
All counts of the complaint in this case have been resolved, except for Count V, by a jury trial. Count V seeks relief for alleged violations of G.L.c. 93A, Sec. 11. Count V was tried to the Court, and the jury’s verdict, in the form of answers to special questions, although known to the Court, was not used by it in any advisory fashion. See, e.g., W. Oliver Tripp Co. v. American Hoechst Corp., 34 Mass.App.Ct. 744, 753 (1993); Acushnet Federal Credit Union v. Roderick, 26 Mass.App.Ct. 604, 606 (1988).
What follows are the Court’s findings of fact, rulings of law and an order for judgment on Count V.

FINDINGS OF FACT

As a matter of both fact and law, the plaintiff, Stoneridge Control Devices, Inc., acting through its Poliak Actuator Division (hereafter “PolLak”), and the defendant, Teleflex Incorporated (‘Teleflex”), for all purposes of this case were engaged in commerce with each other within the requirements of G.L.c. 93A, Sec. 11 and within the meaning of G.L.c. 93A, Sec. 1.
Poliak, for most purposes in this matter, was a potential “tier two” supplier of an actuator device to be used on a Teleflex adjustable pedal system in which Teleflex was a “tier one” supplier of such systems to *336 Ford Motor Company (“Ford”) and other original equipment manufacturers (“OEMs”) of automotive products.
Poliak itself sometimes acted as a tier one supplier to Ford and other automotive OEMs and is sophisticated and fully familiar with the general workings of the automotive industry.
For all purposes of this case, Poliak operated out of its offices and manufacturing facility located in the Dorchester section of Boston.
Teleflex has facilities in many locations, none of which are in Massachusetts. For all purposes of this case, the Teleflex facility most actively involved was located in Michigan, as was the Ford facility involved. Poliak itself has a sales facility located in the Detroit, Michigan area that played a significant role in this matter.
By a pre-sourcing letter dated August 24, 2000, Teleflex informed Pollak of its intention to use Pollak as the motor/actuator source for Teleflex’s future adjustable pedal systems. The letter made the intention contingent upon Teleflex “receiving ongoing business to produce adjustable pedal systems with an electromechanical actuator and the approval of the Pollak actuator use by respective OEM customers.”
Thereafter, Pollak, in its Dorchester facility, began the engineering effort to come up with a satisfactory actuator. Pollak was assisted in this effort by certain system specification information from Ford, provided through Teleflex. From the beginning, a major problem that Pollak struggled with related to the noise of the actuator.
By July of 2001, in part because of Pollak’s need for actuator product specifications, as opposed to adjustable pedal system specifications, and partly because Pollak was by then aware that Teleflex was considering the use of a Daewoo Corporation (“Daewoo”) motor as aback-up if Poliak was unsuccessful, Pollak requested a more binding commitment from Teleflex. This led to the preparation and execution of a Letter of Intent between Pollak and Teleflex. Poliak signed the Letter of Intent in Dorchester on August 13, 2001, and Teleflex signed it the next day in Michigan.
The Letter of Intent characterized itself as an “Agreement” between the two companies. It provided, among other things: “In addition to the pre-sourcing nomination letter provided by Teleflex dated August 24, 2000 . . . Teleflex further agrees that Pollak shall be their designated production supplier of the Adjustable Pedal System Actuator (hereinafter ‘APSA) for the Teleflex Genii Adjustable Pedal System (hereinafter ‘Genii APS’) contingent upon Pollak successfully completing its APSA Design Verification Tests, subject to the technical requirements defined in section four (4) of this agreement.”
The Letter of Intent contained a “Rollout Plan” in which it agreed to designate Pollak as “the single source APSA production supplier” for a substantial array of Ford, Daimler/Chiysler and Nissan vehicles, projected by the respective OEMs to reach as many as 1.8 million platforms by 2005. A “platform” is the word used in the automotive industry for a “vehicle”; e.g., a DEW98 Platform means a Lincoln LS automobile, and a P221 Platform means a Ford F-Series truck.
Section 4 of the Letter of Intent contains an agreement by Teleflex “to carry forth this agreement contingent upon Pollak’s proof-of-concept APSA meeting the following technical requirements.” Thereafter, in Sections 4B and 4C, a number of precise actuator specifications are set forth. The principal specifications for purposes of this case are those relating to sound. They read as follows:
The actuator will produce a maximum 6.0 sones and 0.1 Vacil audible noise with a controlled 86 mNm (12 Oz-in) load applied to one output measured in Poliak’s semi-anechoic chamber at 18" @45 [degree] angle, 12.6 V, room temperature. The audible noise level will be calculated as an average of the noise sample using the Ford SSQTOOL software for adjustable pedal systems.
Section 4A provided as follows:
An evaluation shall be scheduled no more than eight (8) weeks following the signing date of this agreement to determine Pollak’s adherence to these requirements. The target date for the proof-of-concept APSA is September 14, 2001.
The principal issues at trial related to: (1) whether Pollak created a proof-of-concept APSA that complied with all of the technical requirements of the Letter of Intent within the time frame required; and (2) whether Teleflex, in any way that constituted a breach of the implied covenant of good faith and fair dealing with Poliak, prevented or interfered with any opportunity for Ford or any other OEM to consider the use of a Poliak APSA on any Teleflex adjustable pedal assembly on any Ford or another OEM automotive platform in any way that was a substantial contributing factor to the absence of Ford’s or another OEM’s approval.
It was conceded by both Poliak and Teleflex that neither Ford, nor any other OEM, ever approved of a Pollak APSA for any automotive platform.
Pollak claims that it met the necessary technical specifications with a proof-of-concept actuator shortly before September 14, 2001. Teleflex disagrees, and, as noted above, in any event neither Ford nor any other OEM ever approved of that particular proof-of-concept actuator. Nevertheless, Pollak continued its engineering, with Teleflex’s apparent encouragement, and it produced what it claims to have been a compliant proof-of-concept actuator by October 5, 2001.
Thereafter, on October 9, 2001, Poliak, from its Boston facility, announced in writing its production to Teleflex in Michigan, including accompanying summaries of certain test results. Teleflex did not respond *337 in writing, but it did communicate and set up a meeting in Michigan to discuss the situation. Following that meeting, Poliak continued its engineering work, and more testing was performed, this time at Ford and Teleflex facilities in Michigan in November and December of 2001.
Also in December, Poliak, from its Michigan sales office, began sending price quotations to Teleflex in anticipation of completing negotiations for the comprehensive commercial agreement contemplated by Section 5 of the Letter of Intent.
In the meantime, Teleflex, apparently feeling pressed by certain Ford production time deadlines and not being comfortable that Pollak would be able to provide a compliant product in production-ready condition, negotiated with and executed a supply agreement with Daewoo for the purchase of the motors for the Genii APS. The Daewoo supply agreement recites that it was entered into as of “10/25/01.” It was not, however, executed by Teleflex in Michigan until November 16, 2001, and by Daewoo in South Korea until December 21, 2001. Pollak, although aware of Daewoo as a possible back-up, was not aware of the Teleflex/Daewoo supply agreement.
By the end of January 2002, Teleflex advised Poliak that it would not be selected as the supplier of actuators for Teleflex’s adjustable pedal systems.
The jury concluded that Poliak produced at least one version of a proof-of-concept actuator meeting the technical requirements of Section 4 of the Letter of Intent by at least October 8, 2001. Further, the jury determined that the September 14,2001, “target date” in the Letter of Intent was not the final date by which a compliant proof-of-concept actuator had to be produced. While not relying on the jury for any purpose, this Court agrees with the juiy’s conclusions as its findings on those issues. See, e.g., Augustine v. Rogers, 47 Mass.App.Ct. 901 (1999); Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339, 340-41 (1994).
Whether all of the other technical and other requirements of the Letter of Intent were ever met is less clear from the evidence presented. Certainly, Teleflex admitted that all of the technical requirements in Section 4, other than the sound requirements, were met. The Court is unable to find, however, that there was successful completion of the APSA Design Verification Tests as required in Section 1 of the Letter of Intent.
Pollak, in requests for findings of fact submitted post-trial, recites the following on the issue of approval by Ford or other OEMs of Poliak’s actuator:
With respect to the issue of approval by Ford and other OEMs, the defendant breached the implied covenant of good faith and fair dealing in the following ways:
a.By instructing the Ford Design Release Engineer on the P221 platform, Jimmy Chau, to substitute the Daewoo motor for the Pollak actuator on or about October 25,2001, contrary to the defendant’s answers to interrogatories.
b. By making the same decision on other Ford platforms, at least including the T5 (Land Rover).
c. By entering into a long-term agreement with Daewoo as of October 25, 2001, which the defendant signed on November 16, 2001, which essentially precluded (or at least made extremely difficult) any possibility for [Pollak] to obtain the business.
d. By failing to notify Wesley Porter, the Design and Release Engineer on the DEW98 platform (Lincoln LS), of positive developments concerning the Poliak actuator, including, but not limited to, test results in November and December of 2001 and the enthusiastic comments of Norm Otto, a Ford sound expert.
e. By never scheduling the follow-up meeting concerning a “running change” to put the Pollak actuator on the LS as “Job 1 & 90,” as had been specifically planned.
All of the immediately foregoing events or things occurred in Michigan. Pollak further requested the following findings:
Teleflex breached the implied covenant of good faith and fair dealing in the following ways, unrelated to the Ford approval issue (and therefore not necessarily considered by the juiy in its response to special question number 5).
a. By signing the long-term agreement with Daewoo, to which (unlike the plaintiff) the defendant had made no prior commitments to buy motors.
b. By representing, in the context of price negotiations with the plaintiff, that it had “no hard numbers” from Daewoo.
c. By deliberately misstating the Daewoo price with EMC protection at $6.01 (which it described as a “firm quote”), at a time when it had a contractual price of $7.54.
d. By systematically failing to respond to negotiation overtures by the plaintiff, and generally by failing to negotiate in good faith.
e. By ignoring and failing to respond to [Pollak’s] notification on October 9, 2001 that [Pollak] had met the technical requirements of the LOI.
f. By choosing to ignore its obligations to source the APSA business to [Pollak] after receiving notification of [Pollak’s] compliance with the technical requirements (or at least moving forward to obtain Ford approval) because it believed that it had made a mistake in agreeing to the previously negotiated technical requirements.
g. By seeking to unilaterally “amend” the letter of intent by changing three critical terms, and then giving [Pollak] a new “drop dead date” of October
*338 31, 2001, to meet these unilaterally imposed conditions.
h. By making decisions to substitute the Daewoo motor, prior even to the expiration of the new “drop dead date.”
i. By encouraging [Pollak] to continue its development of the APSA after November 15, 2001, even though Teleflex had determined that no further [Poliak] prototype actuators would be shown to Ford, or proposed and supported by Teleflex. Thus, even though [Poliak] developed a POC4 actuator that by December 31, 2001, was superior in terms of noise level to the motor offered by Daewoo, this actuator was never shown by Teleflex to Ford.
Essentially all of the foregoing occurred, or would have occurred, outside of Massachusetts, mostly in Michigan.

RULINGS OF LAW

The last paragraph of G.L.c. 93A, Sec. 11 reads as follows:
No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be on the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.
Teleflex raises this defense, among others, to Pollak’s c. 93A claim. Pollak responds that it is an affirmative defense that was not pled properly.
Mass.R.Civ.P. Rule 8(c) governs the pleading of affirmative defenses. The Rule includes among affirmative defenses “any . . . matter constituting an avoidance.” The Reporters’ Notes to the Rule state that it requires the defendant to set forth “any facts which would entitle him to be absolutely and unconditionally relieved against the plaintiffs claim or cause of action or against a judgment recovered by the plaintiff in such action,” citing to G.L.c. 231, Sec. 31.
The First Circuit, interpreting the cognate Federal Rule 8(c), said that the purpose of the rule is to provide plaintiffs with adequate notice of a defendant’s intention to litigate an aJffirmative defense, thereby affording an opportunity to develop any evidence and offer responsive arguments relating to the defense. Davignon v. Clemmey, 322 F.3d 1 (1st Cir. 2003).
Mass.R.Civ.P. Rule 8(c) also permits a Court “on terms, if justice so requires, [to] treat [a] pleading as if there had been a proper designation.” The leading commentator on the Massachusetts Rules suggests: “[B]ecause the purpose of Rule 8(c) is to provide plaintiff with notice of defenses intended] to [be] raise[d], failure to [p]lead an affirmative defense explicitly may possibly avoid waiver.” See Smith and Zobel, Rules Practice, 6 M.P.S. Sec. 8.6 (2004 Pocket Part).
The pleadings in issue here are found in paragraph 42 of Pollak’s complaint and paragraph 42 of Teleflex’s answer thereto. Those paragraphs read:
The acts which give rise to this c. 93A claim took place primarily and substantially in Massachusetts, as said acts were directed to, received, and detrimentally relied upon by Stoneridge/Poliak in Massachusetts, and the resultant losses to Stoneridge/Pollak occurred in Massachusetts.
Paragraph 42 of the complaint.
Teleflex states that no response is required to the allegations in paragraph 42 as those allegations purport to state legal conclusions. To the extent a response is required, Teleflex denies the allegations.
Paragraph 42 of the answer.
Rule 8(b) mandates that defenses are to be stated “in short and plain terms.” This is similar to the mandate for claims for relief in Rule 8(a). These rules “serve primarily to give fair notice of claims or defenses.” Smith and Zobel, Rules Practice, 6 M.P.S. Sec. 8.1.
While merely the wording of the answer to paragraph 42 of the complaint may seem a bit thin, when read in the context of the purpose for pleading affirmative defenses, the liberality with which notice pleadings are received and the specific authority granted to Courts in Rule 8(c), if justice so requires, to treat a pleading as if there had been a proper designation, this Court is disinclined to rule that the defense has been waived.
The Court must then turn to the issue of whether Teleflex has carried the burden of proving that the acts complained of did not occur primarily and substantially within the Commonwealth.
Until quite recently, this was an issue without any clear-cut test for meeting the requirement. See Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 637 & n. 11 (1985). The Appeals Court had taken a “functional approach” in which it considered whether “the preponderance of the wrongful conduct. . . and . . . the essential elements of the transaction . . . took place in Massachusetts.” Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., 25 Mass.App.Ct. 302, 311 (1988). The Appeals Court rejected a transactional analysis test that would “analyze all aspects of the parties’ relationship to determine which State had the greatest contact with that relationship.” Goldstein Oil Co. v. C.K. Smith Co., 20 Mass.App.Ct. 243, 250 & n.8 (1985).
The United States Court of Appeals for the First Circuit adopted a three-pronged balancing test that looked to (1) where the defendant committed the unfair or deceptive act or practice; (2) where the plaintiff received or acted on the wrongful conduct; and (3) *339 where the plaintiff sustained losses caused by the wrongful conduct. See Play Time, Inc. v. LDDS Metromedia Communications, Inc., 123 F.3d 23, 33 (1st Cir. 1997); Roche v. Royal Bank, 109 F.3d 820, 829, 831 (1st Cir. 1997) (“the pragmatic, functional analysis is not necessarily limited to the three factors”); Clinton Hosp. Ass’n v. Corson Group, Inc., 907 F.2d 1260, 1265-66 (1st Cir. 1990).
The Appeals Court, like the Federal courts, placed little weight on the “place of injury” factor, and rejected it as the determinative factor. See Goldstein Oil Co. v. C.K. Smith Co., supra, 20 Mass.App.Ct. at 249 n.7; Clinton Hosp. Ass'n v. Corson Group, Inc., supra, 907 F.2d at 1266. The site of loss may, nevertheless, be considered in the determination. See Bushkin Assocs., Inc. v. Raytheon Co., supra, 393 Mass, at 638 (“[a]ny loss was incurred in New York”).
The Appeals Court has considered the “place of conduct” to be the determinative factor in at least one case, Goldstein Oil Co. v. C.K. Smith Co., supra, 20 Mass.App.Ct. at 250 & n.8, whereas the Federal courts generally consider the “place of conduct” factor to be “the least weighty” of the three factors. Roche v. Royal Bank, supra, 109 F.3d at 829.
The decisions of the Federal courts suggest that each factor is determined by the number of incidents of wrongful conduct committed and received in a jurisdiction, with no consideration given to the weight or sigificance of a particular incident in the context of the case. See, e.g., Roche v. Royal Bank, supra, 109 F.3d at 830 (“bulk” of wrongful acts; “slightly more” misrepresentations received in Canada); Computer Sys. Eng’g, Inc. v. Qantel Corp., 571 F.Sup. 1365, 1372 (D.Mass. 1983), aff'd, 740 F.2d 59 (1st Cir. 1984) (“more of the relevant transactions and actions occurred within Massachusetts”); Evans v. Yegen Assocs., Inc., 556 F.Sup. 1219, 1228 (D.Mass. 1982) (same). There is some suggestion that the Appeals Court, like the Federal courts, views incidents of wrongful conduct and the reception of wrongful conduct on a quantitative, rather than a case-impact, basis. See Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., supra, 25 Mass.App.Ct. at 311.
Faced with the foregoing history, in 2003 the Supreme Judicial Court, in a case determined at the trial level by this very Court [9 Mass. L. Rptr. 127], added some clariiy to the analysis. See Kuwaiti Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459 (2003).
Justice Spina’s comments in Kuwaiti Danish warrant recitation here. At pages 471-73 (absent the footnotes outlining the state of the law at the time), he said:
We previously have considered the “primarily and substantially” test under the former sec. 3(1)(b) in Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 582 (1982), and Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 638 (1985). Those cases provided a limited opportunity to address the scope of the test. In both cases we declined to create a list of factors to be used in determining whether conduct alleged to be actionable under G.L.c. 93A, sec. 11, occurred primarily and substantially within the Commonwealth. See id. at 637 & n.11; Burnham v. Mark IV Homes, Inc., supra at 580 n.9.
We have misgivings about the utility of a formula for analyzing all cases under sec. 11. Whether the “actions and transactions [constituting the sec. 11 claim] occurred primarily and substantially within the commonwealth” is not a determination that can be reduced to any precise formula. Significant factors that can be identified for one case may be nonexistent in another. Any determination necessarily will be fact intensive and unique to each case. Cases in the nature of contract will be different from cases sounding in tort.
In addition, it may, or may not, be appropriate to decide cases involving wrongful conduct in multiple jurisdictions based on which jurisdiction was the source of the most instances of misconduct. On the one hand, a single instance of misconduct in one jurisdiction may have greater significance for a case as a whole than a multiplicity of instances of misconduct in another jurisdiction. On the other hand, the sheer number of instances of misconduct in one jurisdiction may produce the heft needed to resolve the question. The same observations may be made about the nature and number of instances of misconduct received, and misconduct acted on. As Justice Kaplan noted, “The attempts, however, to single out particular factors that might control the functional inquiry and then to place these factors in some order of importance, are necessarily not fully satisfactory.” Sonesta Int’l Hotels Corp. v. Central Fla. Invs., Inc., supra at 160.
We conclude that the analysis required under sec. 11 should not be based on a test identified by any particular factor or factors because of a tendency to shift the focus of inquiry away from the purpose and scope of c. 93A. Section 11 suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire sec. 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.
Here, Pollak did its engineering work — at great expense in time and money — at its facility in Dorchester. It suffered its damages here as well. But it is starkly clear when applying the SJC’s mandate on this Court to “determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth” that the center of gravity is not in Massachusetts but rather in Michigan. Poliak, in its own *340 requests for findings of fact, quoted at length above, makes this strikingly obvious. The acts which Poliak cites as constituting the basis for breach of the implied covenant of good faith and fair dealing, and the basis for the c. 93A claim, were the acts of Teleflex, essentially all of which occurred, or failed to occur, in Michigan.
Returning to the last paragraph of G.L.c. 93A, Sec. 11: “No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth.” The actions and transactions complained of did not occur primarily and substantially in Massachusetts.

ORDER FOR JUDGMENT

For the foregoing reasons judgment must enter dismissing Count V of the plaintiffs complaint.