CITICORP NORTH AMERICA, INC., formerly known as Citicorp Industrial Credit, Inc., and The Federal Deposit Insurance Corporation, as Receiver of Bank of New England, N.A. and successor-in-interest to New England Merchants Leasing Corporation, Plaintiffs,

v.

OGDEN MARTIN SYSTEMS OF HAVERHILL, INC. and Ogden Corporation, Defendant.

Civil Action No. 97–10232–RGS.

United States District Court, D. Massachusetts.

May 21, 1998.

---

R.A. Fryer, Peabody & Arnold, Boston, MA, for Federal Deposit Insurance Corporation.

Robert D. Keefe, Michael G. Bongiorno, Hale & Dorr, Boston, MA, Douglas K. Mayer, Wachtell, Lipton, Rosen & Katz, New York City, for Citicorp North America, Inc.

John A. Wortmann, Jr., Michael Paris, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Ogden Martin Systems of Haverhill, Inc. and Ogden Corp.

STEARNS, District Judge.

I adopt the Recommendation of the Magistrate Judge and the careful reasoning that supports it as reflected in the Report. I note that no objection to the Report was filed. SO ORDERED.

### REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO DISMISS COUNT VIII OF COMPLAINT (DOCKET NO. 4)

KAROL, United States Magistrate Judge.

To make a very long story tolerably short, and oversimplifying in ways that do not affect the issues under consideration, until December 1986 each plaintiff owned an interest in a Massachusetts partnership,

SBR Associates ("SBR"), that owned a Massachusetts waste-to-energy facility. In December 1986 defendant Ogden Martin Systems of Haverhill, Inc. ("OMSH"), a Massachusetts corporation, purchased each plaintiffs' interest, including each plaintiffs' interest in certain "efficacy" insurance policies that insured against the risk that the facility would fail to meet performance expectations. It was already known by the date of sale that the facility was not meeting such expectations and was in fact experiencing severe operating losses. It was also known that substantial and costly facility modifications were required to bring project revenues up to minimally satisfactory levels and, therefore, that sizeable claims would at some point be made under the efficacy insurance policies by the persons entitled to assert such claims. In setting the purchase price for plaintiffs' interests in SBR, the parties to the sale, all of whom were exceptionally sophisticated, attempted to take these circumstances into account by agreeing to a formula for the sharing of any proceeds OMSH might later recover under the efficacy policies. OMSH subsequently recovered tens of millions of dollars in settlements from the efficacy insurers and tendered to plaintiffs a portion of those proceeds said by OMSH to represent plaintiffs' share under that formula. Plaintiffs protested that the amount tendered fell millions of dollars short of the formula amount and brought this lawsuit to recover the balance they claim is owed. The particular matter under consideration is a motion by OMSH and its corporate parent, co-defendant Ogden Corporation ("Ogden"), under Fed.R.Civ.P. 12(b)(6) to dismiss a count of plaintiffs' complaint which asserts that OMSH's failure and continued refusal to pay to plaintiffs the amounts plaintiffs say they are indisputably owed under the formula constitutes an unfair and deceptive trade practice in violation of Mass. Gen. Laws ch. 93A ("Chapter 93A").[1] For reasons set forth below, I recommend that the motion be DENIED.

1. Some of the counts of plaintiffs' complaint are brought against Ogden, but the count under consideration, Count VIII, is brought only against OMSH. It is unclear why Ogden joined in

## I. THE 12(b)(6) STANDARD

 OMSH makes two arguments in support of its motion to dismiss. First, it argues that the conduct complained of clearly fails to cross the imprecise line that separates ordinary breaches of contract from those that transgress Chapter 93A. Second, it argues that the conduct complained of did not occur primarily and substantially in Massachusetts. Because its motion is made under Rule 12(b)(6), we must, of course, accept all well-pleaded allegations of the complaint as true, construe those allegations in the light most favorable to plaintiffs, and deny the motion unless it appears to a certainty that plaintiffs can prove no facts that would entitle them to recover. E.g., Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); Beddall v. State Street Bank and Trust Co., 137 F.3d 12, 16 (1st Cir.1998). The court, without converting the motion to dismiss into one for summary judgment, may nevertheless also take into account documents whose authenticity is not questioned and on which the allegations of the complaint are expressly based. Beddall, 137 F.3d at 17 ("While a plaintiff only is obliged to make provable allegations, the court's inquiry into the viability of those allegations should not be hamstrung simply because the plaintiff fails to append to the complaint the very document upon which by her own admission the allegations rest.") (emphasis in original). Applying this standard, I may, and do, take into account at least three agreements on which the complaint is based: a Restated Assignment of Claims and Proceeds Agreement (the "Assignment Agreement"), a Stock Purchase Agreement (the "Stock Agreement"), and an Option Agreement among various parties (the "Option Agreement"). (See, e.g., Complaint ¶¶ 28–47, 66–75, 82, 86, 102, and 137, Docket No. 1.) OMSH attaches copies of those agreements or relevant excerpts to its Memorandum of Law in Support of Defendants' Motion to Dismiss Count VIII of Com-

OMSH's motion, but the fact that it did so does not materially affect the analysis and, therefore, will be given no further consideration.

plaint ("Defs.' Mem."), (Docket No. 5), as Exhibits A, B, and C, respectively.

## II. APPLICATION OF THE 12(b)(6) STANDARD

### A. *The Underlying Contract Dispute*

Considering first OMSH's argument that it is clear from the complaint and the foregoing agreements that plaintiffs have alleged, at most, a mere breach of contract rather than a violation of Chapter 93A, a convenient starting point for analysis is the specific language in the agreements out of which the underlying dispute arises, and particularly the language that defines the term "SBR Claims." The term "SBR Claims" is defined in the Assignment Agreement. (Assignment Agreement at 2, Ex. A, Docket No. 5.) Parties to the Assignment Agreement include plaintiff Citicorp North America, Inc., formerly known as Citicorp Industrial Credit, Inc. ("Citicorp"); New England Merchants Leasing Corporation, predecessor-in-interest to plaintiff The Federal Deposit Insurance Corporation, as Receiver of Bank of New England, N.A. ("FDIC"); and OMSH. In a section entitled "Background," the Assignment Agreement recites that various transactions have taken place involving the waste-to-energy facility, referred to in the Assignment Agreement as the "SBR Facility;" that the performance of the SBR Facility "is supported by policies of efficacy insurance" issued by Efficacy Insurers; that the SBR Facility is not meeting performance expectations and is in need of substantial modifications and the funds to finance same; that, to obtain the funds needed to make the modifications, certain parties to the Assignment Agreement "have brought or may bring claims against the Efficacy Insurers [and certain contractors and subcontractors responsible for the construction of the SBR Facility] (collectively the 'SBR Claims');" and that OMSH "has agreed to make certain payments to Citicorp and [FDIC] upon receipt of payment in settlement of the SBR Claims." (*Id.* at 1–2.) The Assignment Agreement then goes on in Section 2 to provide for the assignment to SBR of the "right, title and interest" of Citicorp, FDIC and certain other specified parties (but not OMSH) "in, to and under any and all claims against the Efficacy Insurers [and certain contractors and subcontractors responsible for the construction of the SBR Facility]." (*Id.* at 3.) The effect of the assignment was to give to OMSH, along with a representative of bondholders, the means to bring, control, and collect the proceeds of suits against the Efficacy Insurers. The underlying dispute here primarily concerns the extent to which the amounts admittedly recovered by OMSH from the Efficacy Insurers were recovered pursuant to these assignments and, therefore, were subject to allocation among the parties in accordance with the formula discussed below for determining the price OMSH would pay each plaintiff for its interest in SBR. Specifically, OMSH contends that it need not share with plaintiffs the proceeds of two types of claims against the Efficacy Insurers: claims that arose after the date of the assignment and claims for unfair settlement practices which OMSH asserted against the Efficacy Insurers pursuant to Chapter 93A.

To a lesser extent the present dispute also concerns the manner in which the allocation formula is to be applied to amounts that indisputably were recovered by OMSH pursuant to such assignments. The formula is set forth in the Stock Agreement (as to Citicorp) and the Option Agreement (as to FDIC). Since the formula in both agreements is essentially the same, only the one set forth in the Stock Agreement will be given further consideration. That formula, which appears in Article II, requires, among other things, that OMSH pay to Citicorp specified percentages of two defined components: the "Owner Participants' Recovery Tranche" and the "Shared Recovery Tranche." (Stock Agreement at 3, Ex. B, Docket No. 5.) The former is defined to mean, "with respect to one or more settlements or judgments ... pursuant to the Assignment of Claims and Proceeds ... ('Claims Settlements'), amounts received ... that are in excess of the sum of (i) $4,000,000 and (ii) the costs, not to exceed $1,000,000, of obtaining such Claims Settlements but that are not in excess of $7,000,000 plus such costs." (*Id.* at 4.) The latter is defined to mean, "with respect to Claims Settlements,

amounts received . . . in excess of $12,000,000 plus such costs." (*Id.*) The dispute concerning application of this formula primarily involves the question whether OMSH may recoup out of the proceeds of any recovery its actual litigation costs *in excess of* $1,000,000, before allocating to Citicorp and FDIC their respective shares.

### B. *Transformation of Contract Claim into Chapter 93A Violation*

Not surprisingly, the line that separates "mere breaches of contract" from breaches that constitute unfair acts or practices in violation of Chapter 93A is an elusive one. This much is known: some breaches rise to the level of Chapter 93A violations, *e.g.*, *Anthony's Pier Four v. HBC Associates*, 411 Mass. 451, 583 N.E.2d 806, 821 (1991) ("conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes"), and others do not, *e.g.*, *Ahern v. Scholz*, 85 F.3d 774, 798–800 (1st Cir.1996); *Atkinson v. Rosenthal*, 33 Mass.App.Ct. 219, 598 N.E.2d 666, 670–71 (1992). In *Atkinson*, the Massachusetts Appeals Court surveyed contract cases in which a 93A violation was established, including *Anthony's Pier Four*, and detected in all of them an "extortionate quality that gives [the breach of contract] the rancid flavor of unfairness." *Atkinson*, 598 N.E.2d at 670. In *Ahern*, the First Circuit contrasted *Atkinson's* "extortionate quality" test with a modified *Anthony's Pier Four* test, the modification consisting of the addition of an element of "rascality" to the other requirements set forth by the Supreme Judicial Court. *Ahern*, 85 F.3d at 799. The court found it unnecessary, however, to choose between the two tests, since, as applied to the facts, neither supported a Chapter 93A violation. *Id.* at 799–800.

Part of the difficulty in formulating an all-purpose test, of course, is the uncertainty inherent in the word "unfair," especially when applied to the infinite variety of fact patterns out of which a claim for breach of contract can arise. To compound the problem, whatever words we use to define a concept as inherently imprecise as "unfair-ness" will necessarily be, at best, under-or over-inclusive, because even the most expressive language cannot supply a fixed meaning where none exists. It is therefore hardly surprising that words such as "extortionate" and "rascality" often lead only to further uncertainty. For example, when we say that a breach must have an "extortionate" quality to violate Chapter 93A, do we mean that the party in breach must make an explicit threat, or may a fact finder infer from the mere fact that performance has unjustifiably been withheld that the party in breach is trying to extract a concession to which it is not entitled? Indeed, is an express offer of compromise by a contract debtor who has no valid excuse for nonperformance inherently extortionate, since it carries with it at least the implicit threat that the innocent creditor will have to suffer through the ordeal of litigation if it is unwilling to accept less than it is indisputably owed? Measuring "rascality" is also problematic. Does it reach a higher level if the party in breach brazenly, but forthrightly, states that it has no justification for withholding payment other than to try to extract a concession to which it knows it is not entitled, or if such party instead, perhaps well-coached by its attorney regarding the possible consequences of an overtly extortionate demand, fabricates an excuse for nonperformance which, superficially, is just plausible enough to persuade the innocent party to make the same concession? The former has more of an "extortionate quality," but the latter is surely more deceptive. Along the same lines, to what extent is the level of rascality affected by the relative size of the parties or their relative ability to withstand the war of attrition that predictably will result if the extortionate demand is rejected?

The absence of simple answers to questions such as these, combined with the ordinary requirement that courts use an indulgent standard when evaluating the sufficiency of complaints at the pleading stage, counsels strongly against the dismissal of contract-based Chapter 93A claims before the plaintiff has had an opportunity to discover the facts concerning the alleged breach and to place the breach in context. Putting aside pure legal considerations, dismissal of the Chap-

ter 93A claim at the pleading stage, as a practical matter, will not accomplish much, since the discovery that would have been required with respect to such claim is virtually identical to the discovery that will be required in any event on the underlying contract claim.

On the other hand, it would be misuse of the statute to permit a plaintiff in an ordinary breach of contract dispute to use the *in terrorem* effect of a Chapter 93A claim as a bargaining chip. It would be equally troublesome from the perspective of the judicial system if the existence of such claim were allowed to stand in the way of a reasonable settlement that a plaintiff not blinded by inflated expectations might otherwise be willing to accept. Concerns such as these can easily be exaggerated, since both parties are presumably capable of making a rational evaluation of the merits of the Chapter 93A claim and assigning to it an appropriate settlement value. Nevertheless, such concerns are real enough that contract-based Chapter 93A claims can and should be screened and disposed of at the pleading stage if they are unquestionably without merit. For example, if it is apparent from the complaint that the underlying contract dispute involves nothing more than reasonably conflicting interpretations of a genuinely ambiguous contract term, a court might properly dismiss an associated Chapter 93A claim at the outset. Similarly, a 12(b)(6) motion to dismiss a Chapter 93A claim might appropriately be allowed if the underlying contract issue is whether an admitted, non-de minimis breach by one party to an executory contract is sufficiently material to relieve the other party from further performance obligations under the con-

tract. Generalizing, if it clearly appears from the complaint and the contract itself that reasonable people might reach different conclusions regarding the merits of the underlying contract dispute, then, absent special circumstances, a court should at least give serious consideration to the early dismissal of the 93A count for failure to state a claim.

Applying this standard, OMSH's motion to dismiss must be denied. For OMSH to prevail on the underlying contract dispute, it will have to carry a very heavy burden of establishing that the plainly written contract provisions mean something very different from what they appear to say. The most obvious example is OMSH's attempt to read into the Assignment Agreement a critical limitation that simply does not appear in it. Specifically, OMSH asserts in its memorandum that the term "SBR Claims"—which is broadly defined in the Assignment Agreement to mean "claims against the Efficacy Insurers" that holders of such claims "have brought or may bring"—include "only the claims against the efficacy carriers in existence as of December 1, 1986." (Defs.' Mem. at 6, Docket No. 5.) The simple fact is that the Assignment Agreement does not, by its terms, distinguish between pre- and post-December 1, 1986 claims.[2] Indeed, by its use of the phrase "or may bring," it expressly looks to and incorporates future claims. In the face of this clear language, OMSH attempts to lend some credence to its argument by coining a new term that does not appear in the agreement at all. That term is "Efficacy Claims," complete with initial upper case letters, which OMSH uses to refer to what it characterizes as the entire universe of claims

2. It is not even clear what OMSH means by the term "claims against the efficacy carriers in existence as of December 1, 1986." Suppose, for example, that a design or construction defect in the SBR Facility was causing it to lose money on the date it was sold and would cause it to continue to suffer post-sale losses if the defect were not corrected. When would a claim against Efficacy Insurers for post-sale losses or for the money required to make post-sale corrections come into existence: when the original defective design or construction was completed; when the defect was first discovered; when the contractor refused to make necessary repairs; when *any* losses caused by the defect commenced or when *any*

repair costs were first incurred; or not until some post-sale date, after the *particular* future losses or future costs for which recovery was sought had been sustained or incurred? Is the situation distinguishable from an ordinary tort claim for personal injury, in which the plaintiff is routinely permitted to include in its *existing* complaint a prayer for the recovery of future medical expenses and lost wages, and for future pain and suffering? One would think that parties as sophisticated as these, represented by competent counsel, would have explicitly addressed such issues, if they truly intended to make subtle metaphysical distinctions between existing and future claims.

against efficacy carriers, as distinguished from what it says is the subset of such claims, *i.e.,* those that existed as of December 1, 1986, that were the subject of the Assignment Agreement and identified therein as "SBR Claims." (*See id.*) The problem for OMSH is that the term "Efficacy Claims" does not appear in the Assignment Agreement or other contract documents submitted for review. OMSH's arguments are thus tenuous at best. More to the point, they do not unquestionably establish that reasonable people might reach different conclusions regarding the merits of the underlying contract dispute.

This is not to suggest that OMSH fails to present even a purported basis in the contract documents for the distinction it attempts to make between what it says is the narrow category of "SBR Claims" and the broader category of all "Efficacy Claims." First and foremost, OMSH relies upon the fact that Section 2 of the Assignment Agreement, which refers to the assignment by certain parties to SBR of "any and all claims against the Efficacy Insurers [and others]," does *not* use the defined term "SBR Claims." (Assignment Agreement at 3, Ex. A, Docket No. 5.) Attributing as much significance to this scrivener's oversight as Sherlock Holmes does to a watchdog's silence, OMSH asserts:

> Had the parties intended that *SBR Claims* include *all* claims against the efficacy insurers (regardless of when they arose or by whom they were incurred), the Assignment Agreement would simply have repeated the defined term *SBR Claims* and no broader definition would have been required. The distinction between the *SBR Claims* and all other Efficacy Claims thus demonstrates the limited extent of [OMSH's] payment obligation to [plaintiffs].

(Defs.' Mem. at 6, Docket No. 5 (italics and underscoring in original).)

Putting aside the fact that, as noted, the term "Efficacy Claims" does not appear in any agreement, there are at least two apparent flaws in OMSH's argument. First, the *most* one can say about the parties' failure to use the defined term "SBR Claims" is that it is unexplained. One certainly cannot, on the basis of so little evidence, rationally conclude that the reason the parties did not use such term was that they intended to draw a critical distinction between pre- and post-December 1, 1986 claims—a distinction that is not otherwise mentioned anywhere in the meticulously drafted contract documents.

Second, it is far from clear that the failure to use the defined term "SBR Claims" cannot be explained. Only some of the parties to the Assignment Agreement assigned to SBR their claims against Efficacy Insurers. For example, although OMSH states otherwise in its memorandum, OMSH itself did not assign to SBR the interest it held or was acquiring in claims against Efficacy Insurers. Since the term "SBR Claims" includes *all* claims against Efficacy Insurers, including all claims that all parties to the Assignment Agreement "have brought or may bring," and since the assigning parties could not and did not purport to assign to SBR any claims that belonged to anyone other than themselves, it arguably would have been incorrect for the parties to the Assignment Agreement to use the term "SBR Claims" to refer to the claims they were assigning. After all, one cannot assign claims one does not own. From this perspective, the claims that were assigned to SBR would have been only a subset of all possible claims against Efficacy Insurers, the entire universe of all such claims being defined as "SBR Claims." Under this interpretation, which is far more plausible than OMSH's, it would be impossible for OMSH to have a claim against an Efficacy Insurer that is not also an "SBR Claim." Since the ultimate issue of contract construction is not before me, I do not purport to make a recommendation on such issue. In the context of the present motion it is enough to say that OMSH's interpretation of the Assignment Agreement *may* be sufficiently implausible to raise questions about whether it is asserted in good faith, which in turn preserves at least the possibility that OMSH will be found to have committed an unfair trade practice.

The same may be said concerning OMSH's second principal attempt to find support in the contract documents for its contention that plaintiffs may share only in those recoveries attributable to claims against Efficacy

Insurers that existed as of December 1, 1986. The argument is based on the definition of the term "Net Proceeds," as such term appears in the Trust Indenture that OMSH attached as Exhibit H to its memorandum.[3] The Trust Indenture defines "Net Proceeds" to mean, "with respect to any . . . insurance with respect to a Facility . . . or compensation or damages, (including the Net Proceeds of Efficacy Insuranc[e] *but not including any SBR Claims*) . . . the gross amount from any such . . . compensation or damages less all expenses . . . incurred in the collection thereof." (Trust Indenture at 20, Ex. H, Docket No. 5 (emphasis supplied).) OMSH reads the exclusion of the term "SBR Claims" from the parenthetical term "Net Proceeds of Efficacy Insurance" as further confirmation of the parties' intent to distinguish "between monies received in connection with *SBR Claims* and those received from other efficacy insurance claims." (Defs.' Mem. at 7, Docket No. 5 (italics in original).) Again, even if one could not otherwise explain why the parties excluded "SBR Claims" from the definition of "Net Proceeds," one could not rationally read into such exclusion an intent to distinguish between claims that arose before or after December 1, 1986. Further, whatever uncertainty might otherwise exist concerning the reason for such exclusion is probably eliminated by the definition of the term "Net Proceeds of the Efficacy Insurance," which definition immediately follows in the Trust Indenture. That term is defined to mean "the proceeds of the SBR Claims as defined in the Assignment of Claims," net of certain costs. (Trust Indenture at 20, Ex. H, Docket No. 5.) In other words, the term "Net Proceeds," by its reference to "Net Proceeds of Efficacy Insurance," already incorporates all "[net] proceeds of SBR Claims." The implication is that the term "SBR Claims" was expressly excluded from the definition of "Net Proceeds" but not from the definition of "Net Proceeds of Efficacy Insurance" because the parties wished to include in the term "Net Proceeds" only the *proceeds* of

SBR Claims, not the *unliquidated* SBR Claims themselves. This is exactly what is accomplished by including the "proceeds of the SBR Claims" within the definition of "Net Proceeds of the Efficacy Insurance" but excluding unliquidated "SBR Claims" from the definition of "Net Proceeds." Again, it is not my purpose to attempt to resolve in any definitive way what the parties meant in this or any other agreement related to this complex transaction. It is sufficient for purposes of disposing of the pending motion to say that, after all the facts have been heard, OMSH's narrow definition of "SBR Claims" may be deemed to be so unreasonable as to support a finding of bad faith and unfairness.

OMSH raises two further issues regarding the relationship between the underlying contract dispute and the sufficiency of plaintiffs' Chapter 93A claim. First, OMSH contends that it is at least plausible for it to interpret the contract documents as carving out from plaintiffs' recovery the proceeds of any settlements that OMSH reached with Efficacy Insurers concerning unfair trade practice claims that OMSH had asserted. Second, it contends that the contract documents can plausibly be read to entitle it to recoup all its litigation costs before distributing any settlement proceeds to plaintiffs. There is both a short answer and a long answer to these contentions. Either by itself would be dispositive. The short answer is that, even if OMSH is correct, its motion must be denied because, as noted, the withholding from plaintiffs of a share of recoveries attributable to SBR Claims that arose after December 1, 1986, is, without more, a sufficient basis upon which to permit plaintiffs' Chapter 93A claim to proceed. *See Correa–Martinez v. Arrillaga–Belendez*, 903 F.2d 49, 52 (1st Cir.1990) (complaint may be dismissed for failure to state a claim only if "the plaintiff cannot recover on *any* viable theory") (emphasis added).

The long answer is that OMSH has not clearly established that either contention is plausible. First, no language in the Assignment Agreement, the Stock Agreement, or

3. There is a serious question whether OMSH may draw assistance from the Trust Indenture, since the allegations of the complaint are not at all based upon that document. Since the argument based on the Trust Indenture does not change my recommendation concerning the disposition of OMSH's motion to dismiss, however, I will address it.

the Option Agreement expressly supports the distinction OMSH makes between common law claims and claims under Chapter 93A for unfair or deceptive trade practices. To the contrary, the term "SBR Claims" is defined broadly and without exception to mean all present and future claims that plaintiffs and other holders thereof "have brought or may bring against the Efficacy Insurers." (Assignment Agreement at 2, Ex. A, Docket No. 5.) Claims against the Efficacy Insurers for unfair or deceptive trade practices are certainly claims that plaintiffs would have brought, if they had not sold their interests in the SBR Facility to OMSH and assigned present and future claims to it. Looking beyond this straightforward definition, there is no apparent reason OMSH should not be accountable to plaintiffs for a share of the proceeds of all claims which, but for the assignment, plaintiffs would have had the right to assert in their own names. Finally, if the parties had intended to permit OMSH to retain 100 percent of any settlement proceeds that were traceable to claims against the Efficacy Insurers for unfair or deceptive trade practices, it is difficult to believe that they would not have explicitly addressed such a basic point in their otherwise comprehensive agreement.[4]

OMSH's claim that it is entitled under the contract documents to recoup 100 percent of its litigation expenses before applying the allocation formula to the settlement proceeds is equally implausible. In language that could hardly be clearer, the Stock Agreement and Option Agreement provide that OMSH is permitted to recoup no more than $1,000,000 of its actual expenses before apportioning to plaintiffs their shares of the proceeds. Although the issue of fairness is largely irrelevant when entities as sophisticated as these do battle over the meaning of contract terms, this provision hardly seems unfair.

After all, if OMSH in fact incurred litigation expenses in excess of $1,000,000, plaintiffs would receive *no* share of the first $5,000,000 recovered or of any portion of the recovery between $8,000,000 and $13,000,000. Or, putting it another way, assuming litigation expenses did exceed $1,000,000, plaintiffs between them would be entitled to share only three of the first $13,000,000 recovered. Effectively imposing on OMSH responsibility for expenses in excess of $1,000,000 under these circumstances is not so patently unfair as to suggest that the parties did not mean what they plainly said. More to the point, it cannot be said that OMSH's position on the merits of the underlying contract dispute is so clearly plausible that no reasonable fact finder could find it to have been asserted in bad faith.

### C. *Where Does the Chapter 93A Claim Arise?*

OMSH's second argument in favor of dismissal of the Chapter 93A claim is that the conduct on which it is based, even if unfair, did not occur "primarily and substantially" in Massachusetts. *See* Mass. Gen. L. ch. 93A, § 11 (West 1997). By statute, OMSH has the burden of proof on this issue. *Id.; see Clinton Hosp. Assn. v. Corson Group, Inc.,* 907 F.2d 1260, 1263 (1st Cir.1990).

As the First Circuit recently noted, "How to fit multistate transactions within section 11's formula has been a continuing problem." *M & I Heat Transfer Products, Ltd. v. Gorchev, et al.,* 141 F.3d 21, 23 (1st Cir.1998). Support seems to be coalescing around what the courts have characterized as a "pragmatic, functional" approach to this question. *See Roche v. Royal Bank of Canada,* 109 F.3d 820, 829 (1st Cir.1997); *Clinton Hosp.,* 907 F.2d at 1266; *Boston Hides & Furs Ltd. v. Sumitomo Bank, Ltd.,* 870 F.Supp. 1153, 1166 (D.Mass.1994). Under that approach,

---

4. The contract documents would undoubtedly have been far more complex if the parties had explicitly addressed such point. For one thing, they would have had to deal with the thorny question of how to determine which settlement proceeds were properly traceable to such claims. Plaintiffs would certainly have objected to any proposal that would have given OMSH carte blanche authority to make such judgement unilaterally, and they probably would also have objected to one that would have permitted OMSH and the Efficacy Insurers jointly to decide what portion of the settlement proceeds would be allocated to OMSH's Chapter 93A claims against the Efficacy Insurers. The problem would not have been insoluble, but its importance and the fact that the solution to it is not obvious underscores the implausibility of any suggestion that the parties—particularly parties as sophisticated as these—simply overlooked or chose to ignore it.

no single factor—such as the place of the injury—controls. Rather, the court considers all the factors relating to the transaction, with emphasis, of course, on the conduct that is alleged to be unfair.

 In *Boston Hides*, the court distilled from the case law the following list of factors as bearing on the " 'primarily and substantially' analysis" within the context of a Chapter 93A claim founded on an alleged breach of contract: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) place of performance; (4) the location of the subject matter of the contract; (5) the domicile, residence, nationality, place of incorporation and place of business of the parties; (6) where the defendant committed the alleged deceptive or unfair acts or practices; (7) the location of the plaintiff when the plaintiff acted upon the alleged deceptive or unfair statements; and (8) the situs of the plaintiff's loss." *Boston Hides*, 870 F.Supp. at 1166 n. 22. To this comprehensive list I would add two factors: whether the underlying contract is to be governed by and interpreted in accordance with Massachusetts law, and whether the parties to the underlying contract agreed to submit all contract disputes to Massachusetts (state and federal) courts. My reason for doing so is rooted in the very nature of a contract-based Chapter 93A claim such as the one presented here. In essence, such claim asserts that the party in breach is unfairly attempting to use the burdens and risks associated with the litigation process as a lever to obtain a benefit to which it clearly is not entitled. Those burdens and risks—including cost, delay, perceived local bias, local procedural rules and anomalies, and uncertainty of outcome—cannot be disassociated from the forum in which suit must be brought and from a rational evaluation of any uncertainties inherent in controlling substantive law, for it is precisely

those things that the party in breach is attempting to exploit. Thus, where the Chapter 93A claim is based upon an alleged bad faith breach of contract, it is appropriate to consider whether the contract requires disputes to be heard in Massachusetts courts under controlling principles of Massachusetts law.[5]

Taking all the foregoing factors into account, it cannot be said that OMSH will undoubtedly carry its burden of proving that the conduct complained of did not occur primarily and substantially in Massachusetts. The allegations are that a Massachusetts corporation, under color of Massachusetts law, is holding in Massachusetts and unreasonably refusing to pay over to, *inter alia*, the receiver of a Massachusetts bank (which receiver itself has a regional office in Massachusetts) funds derived from litigation in Massachusetts which constitute the proceeds of insurance on a Massachusetts facility owned by a Massachusetts general partnership, and that it is doing all this in breach of a contract which requires that all disputes be litigated in Massachusetts under Massachusetts law. Not to belabor the point, this is surely enough to survive a motion to dismiss, particularly when the governing statute places the burden of proof on the moving party.

### III. SUMMARY AND RECOMMENDATION

For all the foregoing reasons, I recommend that defendants' Motion to Dismiss Count VIII of Complaint (Docket No. 4) be **DENIED**.

### IV. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for

---

5. For two reasons, there is no inconsistency between giving some weight to the parties' decision to make Massachusetts law controlling and the court's acknowledgment in *Roche* that Chapter 93A liability does not potentially extend to every transaction governed by Massachusetts law. *Roche,* 109 F.3d at 826 n. 7. First, as the court noted, the "choice of law test and the 'primarily and substantially' test," though not identical, are "similar in many respects." Second, the Chapter 93A claim in *Roche* was based upon alleged deception, not upon an alleged bad faith attempt to use governing Massachusetts law as an instrumentality to support an unreasonable interpretation of a contract. (*E.g.,* Defs.' Mem. at 18, Docket No. 5 ("Massachusetts has long recognized that interpretative principles applicable to commercial contracts cannot ignore common sense and the need for such documents to be interpreted as 'rational business agreements.' "))

United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court **WITHIN 10 DAYS** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4, 5–6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 148–149, 106 S.Ct. 466, 471–472, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).

May 4, 1998.