van Gestel, J.
This matter comes before the Court on the third count of the plaintiffs complaint, charging violations of G.L.c. 93A. The remainder of the case was tried to a jury that, on August 18, 1998, rendered its verdict in favor of the plaintiff, Kuwaiti Danish Computer Co. (“Kuwaiti Danish”), on the second count of the complaint alleging misrepresentation. Part of the first count, alleging breach of contract, was determined earlier on a motion for summary judgment. The remainder of the first count was decided by the jury when it concluded that the defendant, Digital Equipment Corporation (“DEC”), did not fail to perform or repudiate its contract with Kuwaiti Danish.
In deciding this c. 93A claim, the Court expressly did not send any part of it to the jury for an advisory opinion. At the same time the Court, obviously, is aware of the jury’s conclusions on the special questions propounded to it. Nevertheless, the Court’s findings and rulings here are its own, and independent from those of the jury.
FINDINGS OF FACT
The plaintiff, Kuwaiti Danish, and its wholly owned subsidiary Kuwaiti Digital Computer Co., the latter a Massachusetts corporation located in Wellesley, were highly sophisticated purchasers and resellers, principally in the Middle East, of computer equipment and computer systems. At least as early as 1984, one or the other — they seemed somewhat oblivious to the technicalities of their corporate status — had numerous business transactions with DEC in Massachusetts wherein they purchased computer equipment for delivery to and resale in Kuwait. This business rela *128 tionship was permitted to lapse in 1989. Thereafter, at DEC’S insistence, Kuwaiti Danish began buying its products destined for Kuwait from DEC’S United Kingdom facility or from DEC’S independent distributor in the United Kingdom who had authority from DEC to resell product destined for Kuwait.
In September of 1990, Iraq invaded Kuwait and in the following January the Gulf War ensued. The Court presumes that DEC, a major world wide producer and marketer of computer products, was fully aware of the war and, at least minimally, cognizant of the physical devastation wreaked upon Kuwait and its infrastructure.
It was in that context and time frame that Farouk Ayoub (Ayoub) of Kuwaiti Digital Computer Co., acting for Kuwaiti Danish, in September of 1991 approached DEC’S Waltham, Massachusetts, office inquiring about the purchase of a significant computer system for the University of Kuwait. There is — believe it or not — a dispute as to whether Ayoub and Kuwaiti Danish concealed from DEC the fact that the University of Kuwait was located in Kuwait, and whether DEC instead was truly of the belief that the University of Kuwait actually had a campus in Washington, D.C. DEC’S Waltham office, in any event, apparently thought that the University of Kuwait had a campus in Washington, D.C., and, therefore, directed Kuwaiti Danish’s inquiry to personnel in DEC’S Washington area office that specifically dealt with sales to educational institutions. That referral included DEC’S sending of a facsimile copy of Kuwaiti Danish’s highly detailed list of computer parts — called configurations — to one Norris Roy (Roy), the designated salesman in its Washington office.
Roy, being a good salesperson, was delighted to receive the lead. In this context, Roy’s investigation of the potential customer began. For a sophisticated computer manufacturer, the investigation was shallow in the extreme. Roy dialed “411" and was told that there was a local Washington, D.C., telephone number for the University of Kuwait. Additionally, Roy asked for a Dun & Bradstreet Report on the University of Kuwait. This report, dated October 2, 1991, reflected that, although its headquarters were in Kuwait, the University had a branch office at the Kuwaiti Embassy in Washington that had as its purpose placing students in American universities. Thus armed, Roy proffers this information as support for his assumption that the University of Kuwait had a campus or educational facility in the District of Columbia area that would have need for the kind of computer system sought by Kuwaiti Danish. It is doubtful that Roy really cared all that much about the University of Kuwait’s location. He was a salesman with a chance to make a large sale.
Roy and Robin McFadden (McFadden), the first DEC sales representative contacted in Waltham, Massachusetts, were not the only DEC employees suggesting an initial assumption that the University of Kuwait was located in Washington, D.C.[1] Roy was designated by his Sales Manager, Luletha Cheatham (Cheatham), another DEC believer in a D.C. situs for the University, to be the salesperson responding to the Kuwaiti Danish inquiry. It was Cheatham who took the initial call from McFadden in Waltham.
Further, before participating in the early conference call described below, Roy had a brief conversation with Robert Burklow (Burklow), the District Operations Manager in charge of “nonstandard pricing terms and conditions,” as well as DEC “policies and procedures.” Burklow’s input was required on nonstandard pricing issues here because, as Roy knew, Kuwaiti Danish was looking for an educational discount.
Kuwaiti Danish was pursuing DEC for computer equipment because it had been awarded a fixed-price turnkey contract from the University of Kuwait to supply, install and maintain a computer system for the College of Engineering at the University. The project was to include DEC VAX 6510 systems, Sun SPARC systems, Apple Macintosh systems and IBM/DOS systems. All of the systems were to be linked and to communicate with each other through a system offered by Kuwaiti Danish.
At the time of the initial contact by Kuwaiti Danish with DEC, it was well along in the process of assembling the various components for the coordinated system. The process involved communications and negotiations with suppliers or manufacturers of the major elements of the system, not just DEC. The contact with DEC was particularly important, however, because the DEC VAX system was the heart of the project. Pricing was also a major consideration, in part because of the fixed-price nature of the arrangement with the University, and partly because it would, therefore, have a direct effect on Kuwaiti Danish’s overall profit on the transaction. Thus, the Kuwaiti Danish representatives were ready, willing and able to negotiate aggressively on the price component. It was on this latter issue that the DEC educational discount became a significant factor.
When Roy received from his colleague McFadden the facsimile describing what it was Kuwaiti Danish was looking for, he called Ayoub, Kuwaiti Digital Computer Company’s representative in Massachusetts. It was Ayoub who had originally called McFadden. Roy had a few questions for Ayoub about some of the components. Once those questions were answered, Roy went into the DEC computerized automatic quoting system and generated a quotation that he says he sent by facsimile to Ayoub on September 24, 1991. The total unit price on this first quotation was $912,885.00, with the educational discount reducing the number to $667,748.50.
Ultimately, there were several additional versions of the DEC quotation. It is notable, however, that even on the veiy first version there were DEC product *129 number designations and power supply requirements that would reveal to even the average electronic technician that the system was destined for use in other than the United States. For example, certain suffixes on key parts numbers indicated use outside this country. Perhaps more obvious were the hertz designations for the frequency of alternating current and certain voltage designations. Power supplies in the United States, for the most part, operate on a 60 hertz, 110 volt system. Power supplies in Europe and the Middle East, however, run on a 50 hertz, 230/240 volt system. On several key items in the DEC quotations to Kuwaiti Danish, there are specifications for “50 HZ”[2] and “240V.”[3]
Roy says that he did not understand the difference in hertz and volts between the United States and other countries. He also suggests that his use of the symbols “HZ” for hertz and “V” for volts on the quotations he generated were just a coincidence. Whatever Roy lacked in knowledge about hertz and volts and their significance to power supplies, the programmers for DEC’S computerized quotation system can hardly have been so vacuous. The program not only produced pricing information, it also insured that the various parts included on the quotation would operate together on the same power supply. This latter aspect of the quotation program requires an understanding of power supplies, including hertz and volts, and a knowledge that 50 HZ and 240V are not found in power supplies common in the United States.
After a few telephone calls between Roy and Ayoub, basically over pricing, there came a time when the price being discussed was •within a range acceptable enough to Kuwaiti Danish to warrant an in-person meeting to conclude the negotiations. This is what prompted the conference call noted above. The call was set up between Roy and Cheatham for DEC, and Ayoub and Fayed Ismail, General Manager of Kuwaiti Danish. Roy and Cheatham were at their respective homes in the D.C. area, Ayoub was in Boston, and Ismail was in France.
Roy involved Cheatham in the conference call because she, as his Sales Manager, was his senior at DEC. Ayoub included Ismail because he was the ultimate decision maker for Kuwaiti Danish. The call produced a meeting in Washington, D.C., of three of the four participants shortly thereafter. Cheatham could not attend, but she told Ismail that Roy could handle it for DEC. Roy made the point — at trial, not on the conference call — that he had no authority to set prices because of the educational discount. The pricing, Roy said, had to come from a higher source, and he indicated that source to be Robert Burklow.
This Court accepts Roy’s testimony on this point and, therefore, draws the reasonable inference that the pricing included in great detail in the various versions of the quotations was a result of consultations and approval by Burklow. In fact, DEC in its answers to interrogatories stated that the quotations “required prior approval of Rob Burklow, which was provided shortly before issuance of the quote." (Emphasis added.)
In the course of the conference call, Ismail and Ayoub were asked to bring some proof that they were acting for an educational institution.
Starting on October 1, 1991, Ayoub, Ismail and Roy began three days of meetings at the Washington, D.C., hotel at which Ismail and Ayoub were staying. The three men went over various evolving versions of DEC quotations until they reached a point of agreement. It is unclear how many separate versions of the quotation were made. Each time a new version was needed, Roy would leave the hotel and go back to his office and prepare it. Each time Roy entered his computer to make a change on the quotation, a new suffix was automatically added to the quotation number. By the time agreement was reached on the final version, the suffix number was “09,” indicating that Roy had entered his computer nine times to make changes.
On October 3, 1991, the third day of the three-day meeting, Roy, Ayoub and Ismail were in agreement with regard to all of the parts and pricing issues on the quotation. The final price, including the educational discount, was $601,799.20.
Roy then announced to Ismail that he needed a purchase order. The parties promptly engaged the services of a hotel stenographer, who prepared the Purchase Order. It was dated October 3, 1991, on the letterhead of Kuwaiti Danish Computer Co., addressed to DEC, signed by Ismail as General Manager, and signed by Roy under the handwritten notation “Original received.” The Purchase Order reads in its entirety:
This Purchase Order in care of Kuwait University for computer equipment from Digital Equipment per Quotation Number 9201KS0174 for $601,799.20.
After reaching agreement on the computer configuration and the price, there was a short discussion about the method of payment. Ismail suggested a letter of credit, which was common in overseas trading, and that was acceptable to DEC. Although he was given the information regarding the letter of credit before he left Washington on October 3, 1991, Ismail misplaced it. Ayoub then called Roy on October 7, 1991, and Roy cooperatively sent a new facsimile to Ayoub with the necessary information. Roy’s note read:
Mr. F. Ayoub
Shawmut Bank of Boston
1 Federal Street
Boston Mass, 02211
Account # 2400005025
ABA Number - 011000206
Digital Equipment Corp
/s/ Norris W. Roy
*130 Backing up in time for a moment, on the first or second day of the three-day hotel meeting. Ismail gave to Roy a copy of a letter from Dr. Abbas Marañe, Dean, College of Engineering and Petroleum, Kuwait University, dated September 15, 1991. The letter, which Roy thinks he received on October 2, 1991, reads in its entirety:
TO WHOM IT MAY CONCERN
College of Engineering, Kuwait University, Kuwait, hereby confirms that KDCC[4] has won a turnkey project for the ECE Dept, to Supply, Install and Maintain DEC VAX 6510 Systems, Sun SPARC Systems, Apple Macintosh Systems and IBM/DOS Systems.
All the Systems are to be linked and communicate to each other via the Racal Interlan Equipment and the multi-vendor Network solution offered by KDCC.
Please apply the special educational prices and facilitate speedy shipment of these systems to the Kuwait University.
This Court finds that whatever may have been the state of knowledge of DEC about what was being bought, for whom, and where it was going before receipt of the letter from Dean Marañe, its continuing belief that this was a purchase for a university located in the District of Columbia would fly in the face of not only logic but absolute fact as well.
The three men expressed pleasure and satisfaction to each other that they had concluded the negotiations, shook hands and departed.
Neither during the course of the three-day negotiations in the D.C. hotel, nor at the happy conclusion thereof, did Roy suggest that any type of additional approval of the sale was required from anyone at DEC.[5] When the three men left the hotel on October 3, 1991, there was nothing further to be done with the Quotation and the Purchase Order.
On the Monday following the three-day hotel meeting, Roy delivered the Quotation, the Purchase Order and the letter from Dean Marañe to Burklow. Burklow noted, “It might be going out of the country. We’ll look into it further.” Although Roy had a couple of telephone conversations with Ayoub in Boston after October 7, 1991, he never mentioned Burklow’s comment. In fact, however, Roy testified at trial that by October 8 or 9 he thought the deal was “dead.” Still he never called Ayoub to alert him to his feeling.
Sometime during the week of October 14, 1991, Cheatham and Roy called Ayoub to report that DEC would not go through with the sale. An outraged Ayoub asked to speak with someone higher up at DEC and was referred to Edward Scully, District Sales Manager. Scully told Ayoub that DEC in Washington could not sell to Kuwaiti Danish because the product was going overseas. Scully said that overseas sales belonged to a different part of DEC. He indicated that there were issues of “proper authorization and government papers.” Apparently, it was not that sales of computers to Kuwait were not permitted, but rather that they were to be handled in a DEC office other than the D.C. office.
Ayoub went still higher at DEC. He next spoke with Robert Nealon at DEC’S facility in Boxboro, Massachusetts. Nealon was in charge of the Operations Department. He told Ayoub that DEC’S educational initiative was available for schools, colleges and universities in the United States only. Nealon, like Scully, said that the sale could not be made out of the Washington, D.C. office. Instead, according to Nealon, Kuwaiti Danish should pursue its attempt to purchase the computer system through DEC’S Country Development Group in Europe. It took Nealon about ten days after he learned about the situation to respond to Ayoub.
At trial Nealon conceded that it is important for a man to know his position in a business transaction and that it would be unfair to string him along if the company knew all along that it was not going to make a sale.
Following DEC’S refusal to go forward with the deal, Kuwaiti Danish moved relatively quickly to effect cover. It issued a purchase order for the same configuration of equipment to Cambridge Trading Services Corporation on October 25, 1991. The total purchase price to Cambridge Trading was $667,300.00.
There were, of course, necessary incidental expenses to Kuwaiti Danish in its search for a new source of supply after DEC refused to proceed. Because Kuwaiti Danish had talked with Cambridge Trading even before it talked directly with DEC, however, it was not a highly complicated or expensive task to resurrect that new transaction.
RULINGS OF LAW
To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness.
VMark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 620 (1994). See, also, Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979).
There is a marked similarity between what happened in Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722 (1974), and Greenstein v. Flatley, 19 Mass.App.Ct. 351 (1985), and what occurred here. In all three cases, relatively sophisticated business persons were dangled on a string and then cast aside by a much bigger, more powerful company. See, also, Pappas Industrial Parks, Inc. v. Psarros, 24 Mass.App.Ct. 596, 598-99 (1987).
Ayoub and Ismail came to Washington to complete the negotiations and make a deal. They left Washing *131 ton three days later, justifiably assuming that they had accomplished their objective. They were happy with the result, and so was Norris Roy, DEC’S representative. It was not unreasonable in any respect for Ayoub and Ismail, on October 3, 1991, to assume that there was agreement on all elements of a contract — the specific items to be purchased and the price for each item were set forth in detail, and a purchase order by them for precisely what had been agreed to had been requested by and. delivered to DEC’S representative. Nor was it unreasonable for Ayoub and Ismail to rely on their perception of what had transpired. Indeed', the discussions went beyond the items, quantity and price, they included the mechanics of payment, by letter of credit to DEC’S Boston bank.
No reasonable business person,- no matter how. sophisticated, would have thought for one moment that DEC, weeks later, would refuse to go through with the transaction because the product was going outside of the United States or because the educational discount was not available to the University of Kuwait. Both of those points — the delivery to Kuwait and the fact that the College of Engineering was located in Kuwait — were known to DEC before' Ismail left the hotel on October 3, 1991. Indeed, the evidence supports a reasonable inference that those facts were known to DEC, or certainly should have been, before Ismail even arrived at the hotel meeting. And yet DEC neither did, nor said, anything to disabuse Ayoub’s or Ismail’s understanding that they were participating in legitimate negotiations with DEC that concluded with an agreement on October 3, 1991.
And what was DEC’S motivation to ostensibly call off the deal because the preferred DEC office was not involved? Certainly, that'was no impediment on the first contact to McFadden in the Waltham office. She— and her boss — quite simply directed Ayoub to the D.C. office and introduced him, through Cheatham, to Roy for servicing. Why didn’t DEC, just as simply, direct Ayoub and Ismail to its Country Development Group in Europe? The answer may lie in the fact that DEC in D.C. had, by this timé and with proper senior executive authorization, agreed to an educational discount of significant proportion. The inference to be drawn from DEC’S actions, and the statements supporting those actions, was that it suddenly realized that an educational discount would not have been granted from its European office and that that office would be upset with the situation if the sale were made with such a discount out of the D.C. office.[6] There was, after all, no legal or U.S. government imposed limitation on the sale of computer products to Kuwait. Indeed, the U.S. had, just months earlier, come to Kuwait’s rescue after the Iraqi invasion and could be presumed to be highly supportive of the rebuilding of Kuwait’s post-war infrastructure.
Whatever was in DEC’S collective corporate mind at the time — whether unscrupulously to hook the poor fish from Kuwait and then skin them for a higher price or merely to cause them to be duped by the “inept blend of hopeful dissembling and dogged bumbling displayed by” DEC’S sales people and their supervisors, see VMark, supra, 37 Mass.App.Ct. at 623 — -it was, to quote Robert Nealon’s testimony, unfair. To use the more expansive words of c. 93A, it was “unfair or deceptive acts or practices in the conduct of . . . trade or commerce." And certainly it fell “within the penumbra of some common-law, statutory, or other established concept of unfairness.” PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).
Before proceeding to the damages aspects of this c. 93A claim, the Court must focus its attention on the issue of whether the acts complained of by Kuwaiti Danish occurred “primarily and substantially” in Massachusetts. This is an element of a see. 11 claim built into the statute. The burden of proving the negative, falls on the party seeking to raise it, here DEC. See G.L.c. 93A, Sec. 11.
Neither the Court nor the parties have been able to locate any appellate decision by the Supreme Judicial Court or the Appeals Court interpreting the phrase “primarily and substantially” as used in G.L.c. 93A, Sec. 11. DEC, however, points-to Bushkin Associates, Inc. v. Raytheon, Co., 393 Mass. 622, 637-39 (1985); Makino U.S.A., Inc. v. Metltfe Capital Credit Corp., 25 Mass.App.Ct. 302-308-311 (1988); and Goldstein Oil Co. v. C.K. Smith Co., Inc., 20 Mass.App.Ct. 243, 248-49 (1985); as providing guidance through the interpretation of essentially identical language once found in c. 93A, Sec. 3(l)(b).[7]
. DEC also cites to a three-factor test applied by the First Circuit Court of Appeals interpreting the “primarily and substantially” language that now appears in c. 93A, Sec. 11. In Clinton Hosp. Ass’n v. Corson Group, Inc., 907 F.2d 1260, 1265-66 (1st Cir. 1990), the court identified the factors as: (1) where the defendant committed the deceptive or unfair acts or practices; (2) where the plaintiff received and acted upon the deceptive or unfair statements; and (3) the situs of the plaintiffs losses due to the unfair.or deceptive acts or practices. Whether these are the factors to be embraced by the Supreme Judicial Court remains to be seen.
This case has significant Massachusetts contacts. The question is whether those contacts are enough to meet the “primarily and substantially” language as inserted in Sec. 11.
The analysis begins by observing that DEC,- at all times material, was a Massachusetts corporation with its corporate headquarters in Maynard. Although far-flung in its business operations, the point of ultimate control was in Maynard.
The initial contact was by Ayoub from Kuwaiti Danish’s Massachusetts wholly owned subsidiary, *132 Kuwaiti Digital Computer Co., to McFadden at DEC’S Waltham, Massachusetts sales office. The two, DEC and Kuwaiti Digital, had done a substantial amount of business in Massachusetts before 1991, in the 1984-88 period.
It was DEC, not Kuwaiti Danish or Ayoub, that moved the servicing of the 1991 inquiry from Waltham to Washington, D.C. Ostensibly this was because of DEC’s confused understanding that the purchase was to be made for a university based in the D.C. area. Before the negotiations reached their seemingly successful conclusion on October 3, 1991, DEC was in possession of ample and clear knowledge that the purchase was to be for the University of Kuwait, College of Engineering, located in Kuwait. Had DEC broken off the negotiations before the culmination on October 3, 1991, it might look a bit clumsy, but it certainly would not be deemed unfair- and deceptive. Further, if such a break-off had then happened, this Court would have no difficulty in ruling that what had by then occurred was not primarily and substantially in Massachusetts.
But things did not stop on October 2, 1991, with the delivery to DEC’s designated representative of Dean Marafie’s letter. In fact, it was from that date forward that the deceptive and unfair stringing along of Kuwaiti Danish by DEG really began. And that stringing along culminated in late October with DEC’s pretextural application of its own internal business policies as a basis for refusing to go forward with the agreement reached' on October 3, 1991. The business policies that formed the underpinning for DEC’s breach were created, issued and imposed from DEC corporate headquarters in Massachusetts. The last, and apparently highest, DEC official to communicáte with Ayoub was Robert Nealon from the Boxboro, Massachusetts office. It was Nealon who reemphasized the DEC policies which effectively slammed the door in the face of the deal.
Although clearly not all acts took place in Massachusetts, on DEC’s side, at least, they were all acts of a large Massachusetts corporation, based in Massachusetts, and the acts taken were predicated or excused by the imposition of that Massachusetts company’s internal business policies. It was DEC in Massachusetts that controlled the field where the game would be played, and it was DEC in Massachusetts that made and enforced the rules of engagement.
DEC employees, when acting in the course of their employment, do not operate in a vacuum, independent from one another and wholly separate from the corporate womb in Massachusetts. It was the headquarters’ policies, enforced by headquarters’ executive personnel, that effected the offensive stringing along that injured Kuwaiti Danish.
The purpose of G.L.c. 93A, Sec. 11, is to instill a general duty of good faith and fair dealing in business transactions. Zapatha v. Dairy Mart, Inc., 381 Mass. 284 (1980). “Conduct ‘in disregard of known contractual arrangements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.” Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451 (1991). The statute “was designed ‘to encourage more equitable behavior in the marketplace . . . [and impose] liability on persons seeking to profit from unfair practices.’ ” Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 25 (1997). Thus, whatever may have been the intent of the General Court in including the “primarily and substantially” language in c. 93A, Sec. 11, it cannot have been to provide shelter for unfair and deceptive acts of Massachusetts-based companies practiced on other Massachusetts-based businesses in transactions whose place of origination was in Massachusetts and whose situs was merely transferred from one DEC office in Massachusetts to another outside of Massachusetts to suit purposes wholly determined by DEC’s internal policies and interests.
While conceding it is not without some question, in the absence of moré fullsome appellate direction, this Court rules that on the facts presented here, and with the reasonable inferences that it may draw therefrom, and imposing the burden of proof on DEC, it has not been shown that the unfair and deceptive acts in issue did not occur primarily and substantially in Massachusetts.
For the period from September 24, 1991, the date of Roy’s issuance of DEC’S first quotation to Kuwati Danish, until at least October 25, 1991, the date Kuwaiti Danish signed its cover agreement with Cambridge Trading, Kuwaiti Danish believed it was in the fair hands of DEC. Itwas between these two dates that this Court finds damages were inflicted upon Kuwaiti Danish by DEC’s unfair and deceptive practices. Those damages are made up of the difference between the purchase price under the aborted agreement with DEC and the purchase price for the same equipment from Cambridge Trading. That amount is $65,500.80. Additionally, Kuwaiti Danish incurred reasonable and expected economic losses in the process of regrouping and effecting the cover achieved. The Court finds those latter damages — for travel, telephone and telefax, and specially engaged technical assistance — to aggregate $25,419.50. The total damages are, thus, found to be $90,920.30.
The Court further finds and rules that DEC was willful and knowing in its actions. It was not just innocently bumbling. A corporation of DEC’s magnitude and sophistication on the subject in issue cannot have been other than fully aware of the actions it took and the consequences thereof. It knew from the start about the significance of this project to Kuwaiti Danish from both a price and a timing standpoint. Its stringing along until it discovered that it agreed to too large a discount and then trying to force Kuwaiti Danish, *133 under known time pressures, to Europe, where the discount would evaporate, was not without knowing intent.
“The multiple damage provisions of c. 93A are designed to impose a penalty.” International Fidelity Ins. Co. v. Wilson, 387 Mass. 841, 856 (1983). Courts are obliged to interpret the statute in a manner that advances its known objective. Id. at 857. “Multiple damages are ‘appropriate punishment’ for forcing plaintiffs to litigate clearly valid claims.” Id.
The Court, therefore, doubles the damages sustained to an aggregate amount of $181,840.60, and further awards to Kuwaiti Danish its reasonable attorneys fees and costs to be hereafter determined.
ORDER FOR JUDGMENT
For the reasons stated above, judgment shall enter in favor of the plaintiff, Kuwaiti Danish Computer Co., on Count Three of its complaint in the amount of $181,840.60, plus reasonable attorneys fees and costs, the latter to be hereafter determined.

The Court can only wonder where the DEC sales force thought the Universities of Massachusetts, Michigan, Arkansas, California or Florida were located, to say nothing of the University of Berlin or Toronto University.

“HZ” is the recognized designation for hertz.

“V” is the recognized designation for volts.

Kuwaiti Danish Computer Corp.

he Quotation is a document printed automatically on DEC’S computer. At the end it contains the statement, “This quotation is an invitation to offer only.” It further provides, “Any contract resulting from the quotation must be accepted at Digital’s Corporate offices by a duly authorized representative of Digital Equipment Corporation.” Roy, Ayoub and Ismail never- discussed any of this language. All that they discussed, with each draft, was the price and the configuration.

The Court’s inference is not made up out of whole cloth. Just a couple of years earlier there was an internal struggle between high level officers in DEC’S Massachusetts headquarters and its office in the U.K. over purchases by Kuwaiti Digital Computer Co. of product in Massachusetts for sale and installation in Kuwait. This internal dispute led to the lapsing of Kuwaiti Digital’s O.E.M. contract with DEC in Massachusetts and some sort of direction by DEC that Kuwaiti Digital should thereafter buy its DEC products in the U.K.

By St. 1983, c. 242, the exemption provided in Sec. 3 was eliminated. The legislative history of the changes in the exemption language is described briefly in Makinos U.S.A., Inc. v. Metlife Capital Credit Corp., supra, 25 Mass.App.Ct. at 308, n.4.